## In re PINE ISLAND UTILITIES CORPORATION.

Docket No. 72408-WS. Order No. 5644.

Florida Public Service Commission.

February 6, 1973.

Sherman A. Katz, Fort Lauderdale, for Pine Island Utilities Corporation.

Davis W. Duke, Jr., Fort Lauderdale, for Park City Home Owners Association, intervenor.

R. M. C. Rose, Tallahassee, for the commission staff and the public generally.

Chairman WILLIAM H. BEVIS, Commissioners PAULA F. HAWKINS and WILLIAM T. MAYO, participated in the disposition of this matter.

Pursuant to notice, the commission by its duly designated hearing examiner, Leon F. Almstead, held a public hearing on this matter on September 15, 1972, in Fort Lauderdale.

### BY THE COMMISSION.

Pine Island Utilities Corporation (Pine Island or utility) is a water and sewer utility operating in Broward County under the jurisdiction of this commission as provided in Chapter 367, F.S. Certificates WS-11 and SS-12 were issued to the utility on August 19, 1960. Tariffs were approved by this commission on November 25, 1970, which tariffs prescribed rules, rates, and regulations for

water and sewer service by the utility to its customers. Investigation by the commission staff disclosed that not all of the utility's customers were receiving metered water service, nor were all customers being charged according to the rates set forth in the approved tariffs. Order No. 5511 was issued on August 25, 1972, requiring the utility to show cause why it should not cease to provide water and sewer service except in accordance with its approved tariff. By its response, Pine Island indicated a willingness to comply with the provisions of the tariff and objections by its customers thereto. This hearing was held to determine the nature of the customers' objections and to obtain facts for the resolution.

By contracts executed in 1959 and 1963, with what in effect is one developer of the park, the utility agreed to provide water and sewer service for a flat rate of $6 per month per mobile home site in one part of the mobile home park (original sheets 26.0 water tariff, and 23.0 sewer tariff and Ex. 3, page 155). By contract executed in 1968, another part of the park was to be served at a graduated rate for residential water service as stated in the residential rate section of the tariff below; sewer service to be charged at $3 minimum for one lot, $1.50 por each additional lot, and $.75 per each additional half lot (Ex. 4, page 242). These contracts were filed with this commission with the approved tariff, but were not approved and are not binding on this commission. City of Plantation v. Utilities Operating Co., 156 So.2d 842.

The utility's tariffs, as approved, provided for charges as

### Water Charges

General and Residential Service

$3 min. — up to 3,000 gal. per month
$ .50 per 1,000 gal., 3,001 to 8,000 gal. per month
$ .40 per 1,000, over 8,000 per month

Multiple Dwelling Service

$2 min. — up to 3,000 gal. per month
$ .50 per 1,000 gal., 3,001 to 8,000 gal. per month
$ .40 per 1,000 gal., over 8,000 gal. per month

### Sewer Charges

General and Residential Service

100% of the water service charge—minimum charge $3 per month.

Multiple Dwelling Service

100% of the water service charge—minimum charge $2 per month times the number of occupied units.

Water consumption has fluctuated greatly, some residential customers using up to 83,000 gallons in one month (Tr. 68-70). In addition, coin laundries and recreation halls were not metered. Installation of meters was completed subsequent to the hearing (Ex. 8).

The above facts are not disputed; however, intervenor Park City Home Owners Association, contends that the rates in the tariff were not legally approved in that Chapter 367, F.S., makes the rates in effect on the date the utility became subject to the jurisdiction of this commission the legal rates until changed in accordance with the provisions of the law; that the rates so determined are different from those in the tariff; and that the law requires a "full rate case" hearing to change the rates.

The position of intervenor's counsel is correct, except that Chapter 367, as adopted in 1959 and as amended in 1967, required this commission, inter alia, upon finding that existing rates of a utility are discriminatory, to determine just and reasonable rates to be thereafter charged. As adopted in 1971, §367.081, F.S., provides —

"(2) The commission shall, after notice and hearing, either upon request or upon its own motion, fix rates which are just, reasonable, compensatory, and not unjustly discriminatory . . ."

Counsel for Park City Home Owners Association argued for a dismissal of these proceedings. He based his contention on the assertion that the non-metered water service actually provided to the customers, and rates being charged therefor, were the real rates being charged and collected by the utility at the time it became subject to jurisdiction, and not the metered rates set forth in the utility's approved tariffs.

He further contended that evidence required by the provisions of §367.081(2) was not before the commission, and the commission could not set rates except by the standards set forth therein.

These arguments are not without merit, but we find that they overlook both the practical necessity and law.

As to the latter, we are reminded that §367.121(1)(a) empowers us to prescribe fair and reasonable rates, and that §367.011(3) requires that the regulation of public utilities is declared to be in the public interest, that this law is an exercise of the police power of the state for the protection of the health, safety and welfare, and that the provisions of Chapter 367 shall be liberally construed for the accomplishment of those purposes.

The gross discrepancy in water consumption, especially considering inclusion of the coin laundries and recreation halls at the res-

idential flat rate, and variations of rates for the same class of customers of the same utility in the same area, are discriminatory. In addition, unmetered water service at flat rates encourages waste of water, whereas metered water service at graduated rates to all customers will encourage conservation. The tariff provisions, adopting the rates of the last above referenced contract, modified to conform to commission rules for service to multiple dwellings, will require the users to pay for water consumed and thereby eliminate the discrimination.

Our examiner found that these unmetered water rates were discriminatory and wasteful, and we wholly agree.

Our twelve years experience in this field has taught us that until some reasonably accurate determination of the actual consumption of water by the customers can be made after the installation of water meters, with charges based upon their individual consumption, no means for determining the actual information required by §367.081(2) may be obtained. Installation of meters upon which charges are not based will not afford us the needed information; therefore, charges based upon metered consumption must be imposed.

Were it otherwise, this utility and its customers would forever be compelled to suffer the abuse of discrimination and waste for want of definitive information upon which to predicate rates fixed upon revenues and expenses in accordance with §367.081(2). For that reason, we conclude that the argument over which rates were properly grandfathered is moot, and the motion to dismiss these proceedings should be denied.

It is recognized that the foregoing rates are different from those in effect in 1960 and will cause a small increase in cost for some customers. However, the modification to graduated rates is necessary to completely eliminate the discriminatory and wasteful flat rates, and when weighed in relation to accomplishment of this objective, the increased cost is minimal and becomes a secondary consideration.

No evidence was presented except as to residential sewer service to single dwellings, for which the approved tariff changed the basis for charges from the per home site to quantity of water consumed. This substantially increases the cost of sewer service to a large portion of the customers without consideration of the factors specified in, and is contrary to the provisions of §367.12(2)(b), F.S., the statute in effect on November 25, 1970. In addition, the provisions of the above contract executed in 1968 deviated from the established rates for sewer service and were therefore improper. The rates for sewer service to single residential units must be returned to $3 per mobile home site, as charged in August, 1960.

The above discussion of rates for both the water and the sewer service does not consider whether or not the rates are compensatory. No evidence was presented as to the factors enumerated in §367.081, F.S., required to make such a determination, and Pine Island should proceed under the provisions of this law for adjustment of its rates.

From the foregoing, we find that — (1) the flat rate charges for water service are wasteful and unjustly discriminatory; (2) the provisions of the tariff for water service as approved on November 25, 1970, are just, fair, reasonable, non-discriminatory, and should be implemented system-wide; (3) the charge of $3 per month per homesite for sewer service for single residential customers in effect in August, 1960, is the legal rate to be charged by Pine Island until a change thereof is approved by this commission.

In the event that temporarily accrued metered water rates provide revenues which exceed a fair return, some reasonable safeguard needs to be employed to protect the customers.

One system we have employed is to require the escrowing of sums which exceed the previous rates, another is the posting of a bond to protect the customers in the event a rate reduction is found necessary. We recognize that neither system is wholly satisfactory since both involve costs of monies which are better spent in the provision of service, but for the reasons we have indicated, we feel that both are superior to the unqualified implementation of the tariff provisions which impose a rate increase, and which could not be ordered refunded to customers in the event the new rates produced excessive revenues.

We will leave the choice of escrowing excess revenues or bonding such revenues to the utility and require that it shall charge water rates under the above mentioned metered tariff provisions for not less than six nor more than twelve months before we enter upon hearings to finalize the determination of rates required to produce revenues from water service which provide to the utility not more than a fair return.

It is therefore ordered that Pine Island Utilities Corporation, of 1491 S. W. 86th Avenue, Fort Lauderdale, Florida 33314, shall cease to provide water service to its customers in Broward County, except in accordance with the rates set forth in its tariff as approved by this commission, pending the final disposition of this matter, as outlined hereinabove.

It is further ordered that Pine Island Utilities Corporation shall within thirty days of the date hereof submit to this commission a plan for the escrowing of revenues in excess of those obtained from

customers by charging the flat rates referred to hereinabove, or provide the bond in U.S. money or the surety of an insurer registered to do business in the state of Florida, in an amount which shall be adequate to refund to the customers the excess of revenues from charges derived from metered water service, as opposed to those customers now receiving unmetered water service.

It is further ordered that Pine Island Utilities Corporation shall within ten days of ninety days after the date of this order submit to this commission a report showing its revenues from its sales of metered water service to its customers, and shall continue to submit such report within ten days of the close of ninety days for each ninety day period thereafter, pending the further order of this commission.

It is further ordered that Pine Island Utilities Corporation shall cease providing sewer service to single residential customers in Broward County except at the rate of $3 per month per homesite.

By order of Chairman WILLIAM H. BEVIS, Commissioner PAULA F. HAWKINS and Commissioner WILLIAM T. MAYO, as and constituting the Florida Public Service Commission, this 6th day of February, 1973.